UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

CIVIL ACTION NO. 12-248-DLB

JAMES J. LEWIS                                                                                    PLAINTIFF


vs.                              **MEMORANDUM OPINION & ORDER**


MICHAEL J. ASTRUE, Commissioner
SOCIAL SECURITY ADMINISTRATION                                                  DEFENDANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of an administrative decision of the Commissioner of Social Security. The Court, having reviewed the record and for the reasons set forth herein, will affirm the Commissioner's decision, as it is supported by substantial evidence.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff James J. Lewis filed an application for supplemental security income and disability insurance benefits on August 19, 2009, alleging disability as of April 7, 2006. (Tr. 148-152). He claims disability due to panic attacks, anxiety, depression, and right knee problems. (Tr. 48-51, 166-167). At Plaintiff's request, an administrative hearing was conducted on December 21, 2010, by Administrative Law Judge Don C. Paris. (Tr. 40-83). On February 4, 2011, the ALJ ruled that Plaintiff was not disabled and therefore not entitled to either benefit. (Tr. 24-39). This decision became the final decision of the Commissioner when the Appeals Council denied review on June 8, 2012. (Tr. 1-6).

1

On August 3, 2012, Plaintiff filed the instant action. The matter has culminated in cross-motions for summary judgment, which are now ripe for adjudication. (Docs. # 11, 12).

## II.  DISCUSSION

### a.  Overview of the Process

Judicial review of the Commissioner's decision is restricted to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Courts are not to conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *See Cutlip*, 25 F.3d at 286. Rather, we are to affirm the Commissioner's decision, provided it is supported by substantial evidence, even if we might have decided the case differently. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). However, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

The ALJ, in determining disability, conducts a five-step analysis. Step 1 considers whether the claimant is still performing substantial gainful activity; Step 2, whether any of the claimant's impairments are "severe"; Step 3, whether the impairments meet or equal

a listing in the Listing of Impairments; Step 4, whether the claimant can still perform her past relevant work; and Step 5, whether significant numbers of other jobs exist in the national economy which the claimant can perform. As to the last step, the burden of proof shifts from the claimant to the Commissioner. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

  **b. The ALJ's Determination**

At Step 1, the ALJ found that there was no evidence that Plaintiff had engaged in substantial gainful activity since the alleged onset of his disability. (Tr. 29). At Step 2, the ALJ found Plaintiff's morbid obesity, panic disorder, posttraumatic stress disorder, social phobia, and torn medial meniscus in his right knee to be severe impairments within the meaning of the regulations. (*Id.*).

At Step 3, the ALJ found that Plaintiff does not have an impairment or combination of impairments listed in, or medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*). In doing so, the ALJ found that Plaintiff's upper and lower extremity conditions do not meet or equal the requirements of Listing 1.02A (major dysfunction of one major peripheral weight-bearing joint) because the record indicated no problems with ambulation. (*Id.*). The ALJ further found that Plaintiff's mental impairments do not satisfy 12.06 (anxiety-related disorders) because they do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. (Tr. 29-30).

At Step 4, the ALJ concluded that Plaintiff has the residual functional capacity (RFC) to perform medium work activity with the additional following restrictions:

occasionally lift and carry [50] pounds, and frequently 25; stand and walk a total of six hours in an eight hour day; sit a total of six hours in an eight hour day; no more than frequently climb ramps or stairs; because of his body habitus, never climb ladders, ropes, or scaffolds; no more than frequently kneel or crouch; and should avoid concentrated exposure to heat, humidity, and again because of body habitus should avoid all exposure to hazards such as unprotected heights and dangers machinery. The claimant also suffers from anxiety-related disorders. However, he would be able to learn, retain, and carry out simple work instructions; sustain concentration, effort, and pace for simple work tasks in two-hour segments in an eight hour work day, five days per week in a non-public, low-stress, object focused work environment in which contact with co-workers and supervisors is casual and infrequent, and can adapt adequately to situational conditions and changes of a normal work setting without excessive productivity demands.

(Tr. 30-31). Based upon this RFC, the ALJ concluded at Step 4 that Plaintiff was able to perform past relevant work as a material processor or dishwasher. (Tr. 33).

Notwithstanding the fact that he concluded Plaintiff could perform past relevant work, the ALJ proceeded to the final step of the sequential evaluation. At Step 5, the ALJ found that there were a significant number of jobs in the national economy that Plaintiff could perform. (Tr. 34). The ALJ based this conclusion on testimony from a vocational expert (VE), in response to a hypothetical question assuming an individual of Plaintiff's age, education, work experience, and RFC. (*Id.*). The VE testified that a hypothetical individual with Plaintiff's vocational profile and RFC could work as a cleaner (19,000 in Kentucky/1,570,000 nationally), laundry worker (2,500 in Kentucky/142,000 nationally), or hand packer (2,500 in Kentucky/944,000 nationally). (Tr. 34-35). Based on the testimony of the VE and Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff is capable of making a successful adjustment to other work and thus concluded that he was not under a "disability," as defined by the Social Security Act. (Tr. 35).

4

**c.     Analysis**

Plaintiff advances six arguments on appeal.  First, Plaintiff argues the ALJ erred by discounting the report by Sheila Virgin.  Second, Plaintiff asserts that the ALJ failed to properly consider the effects of his obesity.[1]  Third, Plaintiff contends that the ALJ erred by discounting the reports by Dr. Melissa Couch and Deborah Whitehouse.  Fourth, Plaintiff claims that the ALJ erred by considering the Global Assessment Functioning (GAF) scores referenced in the Comprehensive Care records.  Fifth, Plaintiff asserts that the ALJ did not fairly consider his reasons for not seeking regular treatment.[2]  Sixth, Plaintiff argues that the ALJ did not fairly credit his testimony.  Each of these arguments will be addressed in turn.

**1.     The ALJ did not err in discounting the Virgin report**

Plaintiff takes issue with the ALJ's treatment of the report authored by Sheila Virgin, a nurse practitioner.  In her report dated August 6, 2010, Ms. Virgin noted that she first examined Plaintiff on June 25, 2010, that his most recent examination took place on that date, that her office records contained a detailed history of Plaintiff, and that the x-ray of his right knee showed "calcification patella, appears chronic and well-corticated." (Tr. 358-

---

[1]Plaintiff's first two arguments–that the ALJ erred by discounting the Virgin report and failed to properly consider the effects of his obesity–were made within the context of his contention that there was no substantial evidence to support an RFC to perform medium work activity.  The Court, though, views and treats these arguments as distinct and thus addresses them independently.

[2]Plaintiff's third, fourth, and fifth arguments–that the ALJ erred by discounting the Couch and Whitehouse reports and by considering the GAF scores, and did not fairly consider his reasons for not seeking regular treatment–were made within the context of his contention that the ALJ did not consider the combined effect of his impairments.  However, as with the first and second arguments, the Court views and treats these arguments as distinct and thus addresses them independently.  *See supra* note 1.

359).  She acknowledged, though, that she had not seen him often, and that she was still awaiting an MRI.  (Tr. 358, 360).

Ms. Virgin opined that Plaintiff had functional limitations stemming from moderate anxiety, depression, and right knee pain.  (Tr. 359).  These limitations included standing and walking no more than one hour in an eight hour day, sitting no more than one hour in an eight hour day, occasional balancing, and never climbing, stooping, crouching, kneeling, or crawling.  (Tr. 360-361).  Ms. Virgin further opined that reaching, handling, feeling, pushing/pulling, seeing, hearing, and speaking were affected by his impairment, but gave no explanation as how those physical functions were affected nor pointed to any medical findings in support.  (Tr. 361).  With respect to her ability to make occupational adjustments, Ms. Virgin indicated that Plaintiff had no ability to deal with the public, interact with supervisors, deal with work stress, function independently, or maintain attention, but again gave little to no explanation with respect to this assessment.  (Tr. 362-363).

In his decision, the ALJ chose to give less weight to Ms. Virgin's reports than the other evidence before him.  (Tr. 33).  In doing so, the ALJ noted that "[m]any of the limits Ms. Virgin sets lack any relationship to the claimant's conditions, and she set those limitations prior to receiving the MRI results or the letter from Dr. [Robert] Hosey describing the claimant's condition.  No evidence supports any unusual restrictions in the claimant's ability to stoop, sit, or tolerate exposure to chemicals."  (*Id.*).  The ALJ further commented that "the opinions of . . . Ms. Virgin include details not described in [her] treatment notes.  However, the claimant appears to have responded to a long checklist of symptoms for his treatment, and it appears that . . . Ms. Virgin [is] merely parroting the claimant's allegations without question."  (*Id.*).  Finally, the ALJ pointed out that the nurse "had limited contact on

6

which to base [her] opinion[], having treated the claimant for only two months prior to completing [this form]."  (*Id.*).

The Code of Federal Regulations distinguishes between opinions from "acceptable medical sources" and "other sources."  *See* 20 C.F.R. §§ 404.1513, 416.913.  Pursuant to this regulatory framework, as a nurse practitioner, Ms. Virgin falls within the latter category. *See* §§ 404.1513(d)(1), 416.913(d)(1) (characterizing nurse practitioners as "other sources").  Because she is not an "acceptable medical source," Ms. Virgin's opinions are neither "medical opinions" as defined in the regulations nor entitled to controlling weight, even though she provided Plaintiff treatment.  *See* §§ 404.1527(a)(2) and (c), 416.927(a)(2) and (c) (defining "medical opinions" as statements from "acceptable medical sources" and providing that "treating sources" may be entitled to controlling weight); §§ 404.1502, 416.902 (stating that an "acceptable medical source" includes "treating sources").

This distinction, though, has its limits, as the criteria for evaluating medical opinions from "acceptable medical sources" is no different than the factors used to assess opinions from "other sources."  SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006).  These factors include:

> How long the source has known and how frequently the source has seen the individual;
>
> How consistent the opinion is with other evidence;
>
> The degree to which the source presents relevant evidence to support an opinion;
>
> How well the source explains the opinion;
>
> Whether the source has a specialty or area of expertise related to the individual's impairment(s), and

Any other factors that tend to support or refute the opinion.

*Id.* at *4-5; *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c) (explaining how medical opinions from "acceptable medical sources" are weighed).

The ALJ's evaluation of Ms. Virgin's opinion clearly complies with Social Security Ruling 06-03; there is no need to reiterate his rationale. The Court will, however, individually address Plaintiff's more specific contentions.

With respect to the ALJ's conclusion that Ms. Virgin is "merely parroting the claimant's allegations without question," Plaintiff points out that Ms. Virgin reviewed an x-ray of his right knee. This contention is not well-taken, as it is nothing more than an attempt to reassess Ms. Virgin's opinion rather than show misapplication of a particular factor. Plaintiff also seeks to downplay Ms. Virgin's limited contact with him by pointing out that office records contained his detailed medical history. Again, this argument is nothing more than an attempt undermine the ALJ's rationale. Finally, Plaintiff contends that Dr. Hosey's letter adds to, rather than subtracts from, the nurse's report. This assertion, however, has nothing to do with the point made by the ALJ in his decision, i.e., that Ms. Virgin set functional limitations for Plaintiff before receiving an assessment from Dr. Hosey. Moreover, it completely ignores the fact that she also did so without the benefit of an MRI.

Because the ALJ properly applied the criteria set forth in Social Security Ruling 06-03, he did not err in discounting Ms. Virgin's reports.

### 2. The ALJ considered the effects of obesity

Plaintiff next argues that the ALJ failed to reference the records supporting his finding that a morbidly obese person could perform medium work activity. More generally, he contends that the ALJ failed to consider the effects of his obesity on his RFC. In

support, he points to Social Security Ruling 02-1p, which reads, in pertinent part:

> [O]besity is still addressed in our listings. In the final rule, we added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems. See listings sections 1.00Q, 3.00I, and 4.00F. The paragraphs state that we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

2000 WL 628049, at *1 (Sept. 12, 2002).

At the outset, the Court notes that the ALJ "is not required to recite the medical opinion of a physician verbatim in his [RFC] finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)). Moreover, the ALJ did acknowledge that records from August 2010 show that Plaintiff is morbidly obese, and found his obesity to be a severe impairment. (Tr. 29, 32). And, in concluding that Plaintiff had the ability to perform medium work activity, the ALJ allowed for the following additional restrictions "because of his body habitus": never climb ladders, ropes, or scaffolds; no more than frequently kneel or crouch; avoid concentrated exposure to heat and humidity; and avoid all exposure to hazards such as unprotected heights and dangers machinery. (Tr. 30-31). Plaintiff's argument, then, is without merit.

### 3. The ALJ did not err in discounting the reports by Couch and Whitehouse

Plaintiff also takes issue with the ALJ's treatment of the reports authored by Dr. Melissa Couch, a psychologist, and Deborah Whitehouse, a nurse practitioner. In her

9

consultive examination report, Dr. Couch noted that she examined Plaintiff on November 9, 2009, that he was given a clinical interview and mental status examination, and that his aunt also provided information. (Tr. 317-318). No medical records, though, were available for review. (Tr. 317).

Dr. Couch diagnosed Plaintiff as suffering from posttraumatic stress disorder, panic disorder without agoraphobia, and social phobia, and deemed his prognosis to be guarded. (Tr. 319). She specifically noted that Plaintiff's condition is impaired, that he has difficulty attending, that he would have difficulty with several aspects of a typical work setting, including relating to peers, co-workers, and supervisors adequately, working with the general public, and coping with stress and pressure, and that he would not be able to maintain pace and persistence or meet deadlines and production quotas. (Tr. 319-320).

In Ms. Whitehouse's report, August 24, 2010, she indicated that Plaintiff had a litany of extreme work limitations related to his psychiatric state and commented that he has trouble leaving home for any reason. (Tr. 365-366). According to the nurse, Plaintiff exhibited numerous signs and symptoms, including psychomotor retardation, motor tension, and vigilance and scanning. (Tr. 364).

In his decision, the ALJ chose to give limited weight to Dr. Couch's evaluation and less weight to Ms. Whitehouse's report than the other evidence before him. (Tr. 32-33). With respect to Dr. Couch, the ALJ noted that "her findings are based in large part on the claimant's report and are inconsistent with the medical records from Comprehensive Care and with claimant's past statements." (Tr. 32). As to Ms. Whitehouse, the ALJ commented that "the opinions of Ms. Whitehouse . . . include details not described in [her] treatment notes. However, the claimant appears to have responded to a long checklist of symptoms

for his treatment, and it appears that Ms. Whitehouse . . . [is] merely parroting the claimant's allegations without question." (Tr. 33). The ALJ also pointed out that the nurse "had limited contact on which to base [her] opinion[], having treated the claimant for only two months prior to completing [this form]." (*Id.*).

Pursuant to the regulatory framework outlined in the preceding section regarding Ms. Virgin, Dr. Couch is an "acceptable medical source," while Ms. Whitehouse is not. *See* §§ 404.1513(a)(2) and (d)(1), 416.913(a)(2) and (d)(1) (characterizing psychologists as "acceptable medical sources" and nurse practitioners as "other sources"). That said, although Dr. Couch's opinion is therefore a "medical opinion" as defined in the regulations, it is not entitled to controlling weight because she was a "non-treating source." *See* §§ 404.1527(a)(2) and (c), 416.927(a)(2) and (c) (defining "medical opinions" as statements from "acceptable medical sources" and providing that "treating sources" may be entitled to controlling weight); §§ 404.1502, 416.902 (stating that an "acceptable medical source" includes "treating sources"). The ALJ's evaluative criteria, then, is the same as to both reports. *Compare* 20 C.F.R. §§ 404.1527(c), 416.927(c) (explaining how medical opinions from "acceptable medical sources" are weighed), *with* SSR 06-03p, 2006 WL 2329939, at *4-5 (explaining how opinions for "other sources" are weighed). As in the preceding section, the Court will not juxtapose the ALJ's rationale against the factors set forth in the regulations and Social Security Ruling 06-03, but will instead address Plaintiff's specific contentions.

With respect to the ALJ's conclusion that Dr. Couch's findings are inconsistent with the records from Comprehensive Care, Plaintiff disagrees and points out to various portions of those records. (Doc. # 11, at 12). Plaintiff, though, makes no attempt to develop this

11

argument, so it is deemed waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal quotations and brackets included).

Plaintiff also contests the ALJ's notation that Dr. Couch's findings are based in large part on the claimant's report by asserting that treatment of the mentally ill primarily depends upon subjective statements, as well as pointing out that Dr. Couch performed a battery of testing. This argument is unpersuasive, as it is an attempt to reassess Dr. Couch's opinion rather than show improper evaluation by the ALJ, and it ignores the ALJ's implicit acknowledgment that Dr. Couch conducted an examination.

Because the ALJ properly applied the criteria set forth in the regulations and Social Security Ruling 06-03, he did not err in discounting the reports by Dr. Couch and Ms. Whitehouse.

### 4. The ALJ did not err in considering the GAF scores

Intertwined with his argument that the ALJ improperly discounted the reports by Dr. Couch and Ms. Whitehouse, Plaintiff complains about the ALJ's reliance upon the GAF scores contained in the Comprehensive Care records. According to those records, both Dr. Timothy May and Rachael Hovermale, a nurse practitioner, assigned Plaintiff a score of 60. (Tr. 413-414, 420). The ALJ subsequently referenced these assessments in his decision, and specifically noted that such a score indicates no more than moderate symptoms. (Tr. 31).

Plaintiff contends that the ALJ's reliance on those scores is contrary to the Commissioner's own rules. In support, he points to the Sixth Circuit's decision in *DeBoard v. Commissioner of Social Security*, 211 F. App'x 411, 415 (6th Cir. 2006), in which the appellate court stated that "the Commissioner 'has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.'" (quoting *Wind v. Barnhart*, 133 F. App'x 684, 692 n. 5 (11th Cir. 2005)) (some internal quotations omitted).

At the outset, the Court notes that, in making this argument, Plaintiff all-but concedes that Dr. Couch's findings are in fact inconsistent with the records from Comprehensive Care. More to the point, Plaintiff has misconstrued *DeBoard* and ignored other Sixth Circuit case law.

In *DeBoard*, the claimant argued that the ALJ erred in not giving the proper weight to an earlier GAF score administered by a purported treating source. *Id.* at 415. The claimant had initially scored a 50, and then subsequently scored a 55 on an exam conducted by a consulting physician. *Id.* The Sixth Circuit rejected this argument, holding that "[a]ny failure to reference [GAF] scores or to compare different scores attributed to the same subject, without more, does not require reversal." *Id.* at 416. In reaching that result, the appellate court mentioned the language referenced by Plaintiff–that the Commissioner has declined to endorse GAF scores for use in disability programs and indicated that they have no direct correlation to the severity requirements of the listings–to explain why it had previously "affirmed denials of disability benefits where applicants had [GAF] scores of 50 or lower." *Id.* at 415 (citations omitted).

13

Assertions made by the Sixth Circuit in two more recent cases are further instructive. In *Oliver v. Commissioner of Social Security*, 415 F. App'x 681, 684 (6th Cir. 2011), the appellate court recognized that "[a] GAF score is . . . not dispositive of anything in and of itself," but it can be "significant to the extent that it elucidates an individual's underlying mental issues." (citation omitted). Perhaps more even more noteworthy, in *Collins v. Commissioner of Social Security*, 357 F. App'x 663, 669 (6th Cir. 2009) the appellate court held that the record supported the ALJ's finding that the claimant only needed conservative mental health treatment because it contained documentation showing that his GAF score improved over time with medical treatment.

In light of a more thorough reading of *DeBoard*, as well as the Sixth Circuit's decisions in *Oliver* and *Collins*, Plaintiff's protestations as to the consideration of these scores fail.

### 5.     Any error by the ALJ in commenting on Plaintiff's failure to seek treatment does not justify disturbing the ALJ's credibility determination

In concluding that Plaintiff could perform medium work activity, the ALJ found that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (Tr. 32). Plaintiff now complains because, in reaching that conclusion, the ALJ noted that Plaintiff "has sought little treatment for his mental health complaints, attending counseling at Comprehensive Care for only a five month period in 2007, and requesting medication from his primary care provider in July of 2010." (Tr. 33). In support of this contention, he points to Social Security Ruling 96-7p, which reads, in pertinent part:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

1996 WL 374186, at *7 (July 2, 1996).

However, even if the ALJ's rationale with respect to Plaintiff's failure to seek treatment ran afoul of Social Security Ruling 96-7p, the ALJ's credibility determination as to Plaintiff's mental health condition must not be disturbed if the additional considerations are otherwise supported by substantial evidence. As the Sixth Circuit explained in *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997):

> The regulations indicate that if disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken. In so doing, the Commissioner has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record. The absence of sufficient objective medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis.

(citations omitted); *see also Felisky v. Bowen*, 35 F.3d 1027, 1040 (6th Cir. 1994) ("None of these factors supports the ALJ's decision to discount Felisky's credibility."). This Court, then, will consider the other reasons set forth by the ALJ.

### i.     Comprehensive Care Records

As discussed in the preceding section, the ALJ referenced the GAF assessments made by Dr. Timothy May and Rachael Hovermale. Again, both medical professionals assigned Plaintiff a score of 60, which suggests moderate symptoms or moderate

15

impairment of social or occupational functioning. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006).

Besides those scores, the ALJ noted that Dr. May diagnosed Plaintiff as suffering from major depressive disorder and panic disorder with agoraphobia, but ruled out psychosis and bipolar disorder. (Tr. 31, 420). He also considered the psychiatric evaluation of Ms. Hovermale, who observed that Plaintiff's speech was goal-directed and reality based, that he exhibited good eye contact and no psychomotor agitation, that his mood was sometimes depressed but other times within normal limits, and that he was articulate, goal-directed, and reality-based. (Tr. 31, 413-414). She diagnosed Plaintiff as suffering from depressive disorder not otherwise specified and panic disorder with agoraphobia, but ruled major depressive disorder without psychotic features and posttraumatic stress disorder. (*Id.*).

### ii. Reports by Dr. Couch and Ms. Virgin

Although the ALJ decided to give limited weight to Dr. Couch's opinion and less weight to Ms. Virgin's report, he did reference certain determinations made by each medical professional. Specifically, Dr. Couch noted that Plaintiff had adequate ability to follow rules and maintain appropriate behavior without disrupting others, that he can work with objects, that he is able to perform simple, repetitive tasks, that he can complete simple one or two step instructions, and that he can recall, understand, and execute basic instructions. (Tr. 32, 317, 319-320). Furthermore, Ms. Virgin indicated in her report that Plaintiff suffers from only moderate anxiety and depression. (Tr. 32, 358-359).

### iii. Plaintiff's Statements

Finally, the ALJ noted various statements made by Plaintiff that undermined the credibility of his complaints. While he claims an isolated, reclusive life with no social contact, the ALJ pointed out that intake notes from Comprehensive Care indicate that Plaintiff described himself as Wiccan and stated that he attended meetings and found them supportive. (Tr. 33, 415). The ALJ further noted that medical records from August 2007 contain Plaintiff's report of an assault that occurred at a friend's apartment. (Tr. 33, 254). Finally, while Plaintiff claims performs no household chores, the ALJ pointed out that Plaintiff has reported that he cares for his personal hygiene and can cook, clean, and perform other chores. (Tr. 33, 317, 319).

These justifications are reasonable and supported by substantial evidence in the record. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ's comment, then, does not justify disturbing the his credibility determination.

### 6. Plaintiff's argument as to the ALJ's consideration of his testimony is without merit

Plaintiff's last contention is that the ALJ did not fairly credit his testimony that he could only walk fifteen to twenty feet and stand about ten minutes, and that he has trouble getting in and out of vehicles due to his knee problems. (Tr. 54). In support, he points to Social Security Ruling 96-7p, which reads, in pertinent part:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

1996 WL 374186, at *2.

According to Plaintiff, this case mirrors *Berkowski v. Comm'r of Soc. Sec.*, 652 F. Supp. 2d 846, 856-857 (E.D. Mich. 2009), in which the Eastern District of Michigan concluded that the ALJ's credibility determination with respect to the severity of pain allegations was not supported by substantial evidence because he did not explain how he discounted the claimant's statements. Specifically, the ALJ did not address either the claimant's reports of pain, the physician's reports of the effectiveness of pain management and medication, or the claimant's need to lie down, and misstated the claimant's activities of daily living. *Id.* at 856.

This case is nothing like *Berkowski*. Again, the ALJ noted various contradictory statements made by Plaintiff, including that he cares for his personal hygiene and can cook, clean, and perform other household chores. The ALJ also acknowledged that the MRI of Plaintiff's right knee identified a tear in the posterior horn of the medial meniscus, but further commented that the letter from Dr. Hosey states that Plaintiff did not need surgery. (Tr. 32, 377, 379). Instead, Dr. Hosey felt that Plaintiff only needed to wear a knee brace for stability, work on strengthening exercises, and lose weight. (Tr. 32, 377). As in the preceding section, there is no reason to justify disturbing the ALJ's credibility determination.

### III. CONCLUSION

For the reasons stated herein, the Court concludes that the ALJ's finding that Plaintiff was not disabled for purposes of the Social Security Act was supported by substantial evidence. Accordingly, for the reasons stated,

**IT IS ORDERED** as follows:

1. The decision of the Commissioner is supported by substantial evidence and is hereby **AFFIRMED**;

2. Plaintiff's Motion for Summary Judgment (Doc. # 11) is hereby **DENIED**;

3. Defendant's Motion for Summary Judgment (Doc. # 12) is hereby **GRANTED**;

4. A Judgment affirming this matter will be entered contemporaneously herewith.

This 22nd day of March 2013.



Signed By:
*David L. Bunning*   DB
United States District Judge

G:\DATA\SocialSecurity\MOOs\Lexington\5-12-248 Lewis MOO.wpd